#28722-a-PJD
**2020 S.D. 6**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

JOSHUA JOHN ARMSTRONG,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBIN J. HOUWMAN
Judge

* * * *

CHRISTOPHER MILES
BEAU J. BLOUIN of
Minnehaha County Public
   Defender's Office
Sioux Falls, South Dakota                          Attorneys for defendant
                                                   and appellant.


JASON R. RAVNSBORG
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                               Attorneys for plaintiff
                                                   and appellee.

* * * *

ARGUED
OCTOBER 2, 2019
OPINION FILED **01/29/20**

#28722

DEVANEY, Justice

[¶1.]    Joshua John Armstrong wrote and mailed two letters containing threats to rape and murder a mental health therapist at the prison where Armstrong was incarcerated.  After a trial, the jury found Armstrong guilty of one count of threatening to commit a sexual offense in violation of SDCL 22-22-45.  Armstrong appeals the circuit court's denial of his motion for judgment of acquittal and its refusal of his requested jury instructions pertaining to the language of "directly" in SDCL 22-22-45 and specific intent.  We affirm.

**Factual and Procedural Background**

[¶2.]    Armstrong has been an inmate in the South Dakota State Penitentiary since his 2009 conviction of sexual contact with a person under sixteen.  *See State v. Armstrong*, 2010 S.D. 94, 793 N.W.2d 6.  In 2016, Armstrong prepared an envelope of letters and other documents to be sent to the Compass Center in Sioux Falls.  The Compass Center is an organization that provides services for victims of domestic and sexual assault, including services to prisoners who wish to report sexual harassment or assault occurring within the prison.  Armstrong addressed the envelope to "P.R.E.A."—the acronym for the federal Prison Rape Elimination Act.  Under that Act, prison staff could not open Armstrong's envelope and review the documents before mailing.

[¶3.]    Armstrong's envelope arrived at the Compass Center on August 11, 2016.  Michelle Markgraf, executive director at the Center, read and reviewed the contents of the envelope.  She observed that the envelope contained a three-page letter addressed to PREA, an eighteen-page letter addressed to Governor Dennis

Daugaard, a completed commissary order form, documents alleging Armstrong's sex offender treatment program was being used as a weapon against him, handwritten quotes from this Court's 2010 opinion affirming Armstrong's 2009 conviction, two drawings, and two stories. Only the letters to PREA and Governor Daugaard are relevant to this appeal.

[¶4.] In his letter to PREA, Armstrong introduced himself and claimed that he had sent previous, unanswered letters to the Compass Center. He then begged for help, asking that PREA "read, copy, file and forward all but this letter to Governor Daugaard[.]" He expressed concern that the Department of Corrections had been withholding his mail and asked that the Compass Center "answer this letter." He further wrote, "I want you to know that I am absolutely serious about what I said about [K.H.]. I have got nothing to lose and everything to gain by raping and killing her or a guard." "K.H." is actually "C.H."—a mental health therapist at the penitentiary. Armstrong was housed in her unit.

[¶5.] Armstrong's letter continued: "At least I will be serving time for a crime that I actually committed and to be honest I would rather die of lethal injection than sit in this cell suffering from untreated psoriasis and thoughts that I can't seem to stop." He explained, "I know that I can not live like this much longer and fight my own conscience every day to keep me from raping [C.H.] or a guard, but if the warden and Governor are willing to sacrifice her I might as well." Finally, he wrote, "What would you do? Please let me know if or when you forward the letter to Daugaard. I want to know where I stand and what I need to do in my near

future.  If you don't respond by August 26, 2016 I will assume that I am on my own and might as well die embarrassing South Dakota's government."

[¶6.]         Armstrong's letter to Governor Daugaard also referenced C.H. and explained in even greater detail that Armstrong would rape and kill her unless Governor Daugaard gives Armstrong "what [he] demand[s]."  We need not restate his exact words for it is sufficient to note that Armstrong's language concerning C.H. is disturbingly detailed, violent, graphic, and pornographic.  Among the threats, Armstrong presented Governor Daugaard "with four options" "to keep [C.H.] from being raped and murdered."  He later reduced the Governor's options to two, which included the placement of several hundreds of thousands of dollars in various accounts and required that Armstrong receive a full pardon.  Armstrong concluded his letter with the following statement: "If you choose to ignore this letter I hope that when you force me to rape someone like [C.H.] or a guard that my attorney will subpoena this letter . . . as evidence against South Dakota[.]"

[¶7.]         After reading the contents of Armstrong's letters, Markgraf notified the South Dakota Division of Criminal Investigation.  An agent interviewed Armstrong who admitted that he had written the letters, but denied that C.H. was in danger.  However, when asked whether his writings were an actual threat, he responded, "Actually, like I said I do not know.  I mean if I have to do something stupid like that I will."

[¶8.]         Ultimately, a grand jury indicted Armstrong on one count of threatening to commit a sexual offense in violation of SDCL 22-22-45.  The State filed a part II information alleging Armstrong to be a habitual offender.  The State

also filed a notice of election to proceed on the doubling statute, which allows the court to sentence a defendant to double the maximum term allowed for the commission of the crime when the crime was committed while the person was incarcerated. *See* SDCL 22-6-5.1. Armstrong pled not guilty.

[¶9.] Prior to trial, Armstrong and the State stipulated that Armstrong is an inmate in the penitentiary and has been previously convicted of two felony sex offenses. The State presented the stipulation to the jury during trial. At the close of the State's case, Armstrong moved for judgment of acquittal. He argued that the State had failed to present sufficient evidence that he *directly* threatened C.H. The circuit court denied Armstrong's motion.

[¶10.] Armstrong testified at trial and denied making any direct threats to C.H. He explained that the only reason he sent the letters was to "get in front of a jury" and "to go on record" with his complaints against the Department of Corrections and against his sex offender treatment counselors who testified at his previous trial. During the settling of jury instructions, Armstrong requested an instruction that would inform the jury that "directly" as used in SDCL 22-22-45 modifies both "threatens" and "communicates." He requested another instruction on specific intent. The circuit court refused both instructions, and the jury found Armstrong guilty.

[¶11.] Armstrong appeals, asserting the circuit court erred in denying his motion for judgment of acquittal and in refusing his requested instructions.

## Standard of Review

[¶12.]      We review a denial of a motion for judgment of acquittal de novo. *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83.  We likewise review questions of statutory interpretation de novo.  *State v. Johnsen*, 2018 S.D. 68, ¶ 9, 918 N.W.2d 876, 878.  We review the alleged error in refusing requested jury instructions under the abuse of discretion standard.  *State v. White Face*, 2014 S.D. 85, ¶ 14 n.1, 857 N.W.2d 387, 392 n.1.  Jury instructions, while generally within the circuit court's discretion to grant or deny, must "be considered as a whole, and if the instructions so read correctly state the law and inform the jury, they are sufficient."  *State v. Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263 (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 13, 772 N.W.2d 117, 121).

## Analysis and Decision

[¶13.]      Armstrong asserts the circuit court abused its discretion in denying his motion for judgment of acquittal because, in his view, the word "directly" as used in SDCL 22-22-45 modifies both "threatens" and "communicates," and the evidence was insufficient to support that he "directly threatened or communicated a specific intent to commit further felony sex offenses[.]"  In the same vein, Armstrong contends that the circuit court erred in refusing his requested instruction informing the jury that "directly" modifies "threatens" and "communicates."  Finally, Armstrong argues that the circuit court erred in refusing his requested instruction indicating that SDCL 22-22-45 requires the jury to find that he acted with specific intent.

[¶14.]     Because Armstrong's arguments raise issues of statutory interpretation, we begin our analysis by examining the text of SDCL 22-22-45, which provides in relevant part:

> Any person who has been convicted of a felony sex offense as defined in § 22-24B-1 who directly threatens or communicates specific intent to commit further felony sex offenses is guilty of threatening to commit a sexual offense.

*Whether "directly" modifies both "threatens" and "communicates"*

[¶15.]     Armstrong asserts that the word "directly" as used in SDCL 22-22-45 refers to the manner of delivery of the threat or communication and, therefore, modifies both "threatens" and "communicates."[1]  He further contends that the absence of the word "indirectly" indicates legislative intent to criminalize only threats "communicated or delivered, whether orally, through a letter, email or other social medium, directly to the object of the threat."

[¶16.]     We construe statutes to determine the intent of the Legislature.  *State v. Geise*, 2002 S.D. 161, ¶ 10, 656 N.W.2d 30, 36.  "The intent of the Legislature in enacting laws is ascertained primarily from the language used in the statute."  *State v. Bordeaux*, 2006 S.D. 12, ¶ 8, 710 N.W.2d 169, 172.  "We therefore defer to the text where possible."  *Geise*, 2002 S.D. 161, ¶ 10, 656 N.W.2d at 36.  "When the

---

1.     Armstrong requested the following instruction:

> Throughout the instructions, the adverb, directly modifies both the words "threatened" and "communicated".

> In order to convict Mr. Armstrong as to Count 1, you must find beyond a reasonable doubt that he directly threatened or directly communicated specific intent to commit a further felony sex offense.

language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *State v. Myrl & Roy's Paving, Inc.*, 2004 S.D. 98, ¶ 6, 686 N.W.2d 651, 654 (quoting *Martinmaas v. Engelmann*, 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611).

[¶17.] From our review of the statute as a whole, we believe that the Legislature did not intend for the word "directly" to modify "communicates." First, if the Legislature intended the adverb "directly" to modify the manner in which the prohibited communication must be delivered, it could easily have said so, but it did not. Second, this Court has indicated that the word "or" is ordinarily read as a disjunctive and thus phrases separated by a disjunctive may be interpreted as independent of each other. *See, e.g.*, *State v. Bosworth*, 2017 S.D. 43, ¶ 23, 899 N.W.2d 691, 697–98; *Fisher Sand & Gravel Co. v. S.D. Dep't of Transp.*, 1997 S.D. 8, ¶ 27, 558 N.W.2d 864, 870; *Candee Constr. Co., Inc. v. S.D. Dep't of Transp.*, 447 N.W.2d 339, 344 (S.D. 1989).

[¶18.] Here, by including two clauses—"directly threatens" and "communicates specific intent"—and separating the clauses with "or," the Legislature described two separate ways in which SDCL 22-22-45 can be violated. One can violate the statute by directly threatening to commit a further felony sex offense, which could include the scenarios suggested by Armstrong, i.e., where the threat is stated or delivered directly to the object of the threat.[2] Additionally, one

---

2. The State argued to the jury that Armstrong's letters constituted a "direct threat" because they contained a specific threat toward a specific victim.

(continued . . .)

can violate the statute by communicating a specific intent to commit a further felony sex offense, which encompasses a broader category of behavior that could include threats communicated to or through third parties.

[¶19.]     Moreover, the inclusion of the phrase "specific intent" after "communicates" also supports an interpretation that the Legislature did not intend "directly" to modify "communicates." When a threat is stated or delivered directly to the object of the threat, the intention of the person delivering the threat may be more easily ascertained. In contrast, the author's intent may not be as easily ascertained when a communication is delivered indirectly. Therefore, requiring proof that the person communicated "specific intent" ensures that the character of the communication is such that there is no question as to what the author intended.

[¶20.]     Armstrong, however, contends that the Legislature did not intend for SDCL 22-22-45 to criminalize *indirect* threats. As support, he cites *In re C.C.H.*, 2002 S.D. 113, 651 N.W.2d 702 and *State v. Paulson*, 2015 S.D. 12, 861 N.W.2d 504. Both cases can be distinguished based upon their facts and the issues raised.

[¶21.]     *C.C.H.* involved a juvenile adjudicated on a disorderly conduct charge for making threatening remarks to his teacher regarding another student. 2002 S.D. 113, ¶ 4, 651 N.W.2d at 704. The juvenile asserted as a defense that his words

---

(. . . continued)

    While this is a correct application of at least one definition of the term "direct" when used as an adjective describing the communication, Armstrong correctly points out on appeal that the term "directly" (an adverb) pertains to the *manner* of threatening or communicating. The State's argument relates to the *nature* of the communication and is more on point as to whether Armstrong's letters communicated a specific intent to commit a further felony sex offense.

were mere frustration, and therefore, protected speech under the First Amendment. In applying a multi-faceted test from the Eighth Circuit Court of Appeals to determine whether a statement is a true threat outside of First Amendment protection, we noted that C.C.H.'s threats were not "communicated directly" to the intended victims. *Id.* ¶¶ 14–15, 651 N.W.2d at 706–07 (applying test from *Doe ex rel. Doe v. Pulaski Cty. Special Sch. Dist.*, 263 F.3d 833, 836–37 (8th Cir. 2001)). However, the *Pulaski County* decision was vacated on rehearing en banc, and we have since applied the test set forth by the en banc Eighth Circuit Court of Appeals that originated from *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996). *See State v. Draskovich*, 2017 S.D. 76, ¶ 9, 904 N.W.2d 759, 762 (quoting *Doe ex rel. v. Pulaski Co. Special Sch. Dist.*, 306 F.3d 616, 622 (8th Cir. 2002) (en banc) (requiring an analysis of the entire factual context of the alleged threat when deciding "whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future'")).

[¶22.] Notably, in *Draskovich,* even though we examined whether the alleged threat was communicated directly to the object of the threat, we did not find that factor in and of itself to be dispositive when addressing a First Amendment defense. 2017 S.D. 76, ¶ 16, 904 N.W.2d at 764; *see also Austad v. South Dakota Bd. of Pardons and Paroles*, 2006 S.D. 65, 719 N.W.2d 760 (concluding that inmate's statements threatening his parole officer were true threats even though they were communicated to his mental health counselors rather than directly to the parole officer). Moreover, Armstrong is not contending here that his threats were protected speech. Rather, unlike the First Amendment defense raised with respect

to the disorderly conduct charge in *C.C.H.*, this case hinges on our interpretation of the statutory language in SDCL 22-22-45 criminalizing specific types of communications.

[¶23.]     *Paulson* is also not on point.  In *Paulson*, the defendant was convicted of threatening a circuit court judge in violation of SDCL 22-11-15.  2015 S.D. 12, ¶ 4, 861 N.W.2d at 504.  Under SDCL 22-11-15, "[a]ny person who, directly or indirectly, utters or addresses any threat or intimidation to any judicial or ministerial officer . . . with intent to induce the person either to do any act not authorized by law, or to omit or delay the performance of any duty imposed upon the person by law, or for having performed any duty imposed upon the person by law, is guilty of a Class 5 felony."  Paulson alleged that the evidence submitted to the jury was insufficient to support his conviction under this statute because the writings at issue derived from another source and were not his own.  *Id.* ¶ 15, 861 N.W.2d at 508.  We rejected his argument, not only because evidence suggested he was in fact the author, but also because we concluded that one may "indirectly" threaten a judicial officer by offering another's work.  *Id.* ¶ 16.  Here, Armstrong admitted authoring the letters containing the threatening statements.

[¶24.]     Armstrong nonetheless points to the fact that SDCL 22-11-15 includes the words "directly" and "indirectly," while SDCL 22-22-45 only includes the term "directly."  He argues that if the Legislature intended SDCL 22-22-45 to include indirect communication of threats, it would have included the term "indirectly" as it did in SDCL 22-11-15.  In support of this argument, Armstrong asks us to apply the general rule of statutory construction that "the expression of one thing is the

exclusion of another." *See, e.g., Aman v. Edmunds Cent. Sch. Dist. No. 22-5*, 494 N.W.2d 198, 200 (S.D. 1992).

[¶25.]    However, "[t]he general rule that the express mention of one thing in a statute implies the exclusion of another 'is merely an auxiliary rule of statutory construction, to be applied with great caution[,]'" because application of the general rule may not always be consistent with the Legislature's intent. *Argo Oil Corp. v. Lathrop*, 76 S.D. 70, 74, 72 N.W.2d 431, 434 (1955) (citation omitted). Such is the case here. Construing SDCL 22-22-45 as Armstrong suggests would make the second clause—"communicates a specific intent"—redundant. Indeed, directly threatening to commit a sex offense, or directly communicating a specific intent to commit a sex offense, carry essentially the same meaning. *See Paulson*, 2015 S.D. 12, ¶ 14, 861 N.W.2d at 508 (quoting the Black's Law Dictionary definition of a "threat" as "[a] communicated intent to inflict harm or loss on another"). *See also Bosworth*, 2017 S.D. 43, ¶ 19, 899 N.W.2d at 696 (citation omitted) ("We assume that the Legislature intended that no part of its statutory scheme be rendered mere surplusage.").

[¶26.]    Having determined that the Legislature did not intend for the word "directly" to modify both "threatens" and "communicates," we conclude that the circuit court properly refused Armstrong's requested instruction connecting "directly" to both "threatens" and "communicates." We further conclude that the circuit court properly denied Armstrong's motion for judgment of acquittal, which was based on his incorrect interpretation of the statute.

*Whether SDCL 22-22-45 is a specific intent crime*

[¶27.]       Armstrong argues that SDCL 22-22-45 is a specific intent crime because the statute includes the phrase "specific intent." To determine whether a crime requires specific or general intent, we examine the conduct proscribed by the legislative enactment. *State v. Taecker*, 2003 S.D. 43, ¶ 25, 661 N.W.2d 712, 718. "Specific intent has been defined as 'meaning some intent in addition to the intent to do the physical act which the crime requires,' while general intent 'means an intent to do the physical act or, perhaps, recklessly doing the physical act which the crime requires.'" *State v. Rash*, 294 N.W.2d 416, 417 (S.D. 1980) (citation omitted).

[¶28.]       However, in *State v. Huber*, we acknowledged the confusion that often flows from an attempt to distinguish between specific and general intent, in part, because the terms can "have different connotations in different contexts." 356 N.W.2d 468, 472–73 (S.D. 1984) (referring to "an entirely different connotation" of "specific intent" when applied to the doctrines of diminished capacity and voluntary intoxication). Ultimately, we concluded in *Huber* that the use of the term "intentionally" in the statutes defining eluding and resisting arrest did not require the giving of a specific intent instruction. *Id.* at 473. In so holding, we explained that "[w]hether one consciously desires a result or is practically certain that a particular result will follow an act goes toward determining whether an act was done knowingly, purposely, recklessly, or negligently." *Id.* But just because a statute requires that an act be done intentionally or knowingly does not necessarily make it a "specific intent" crime. *Id.*

[¶29.] Although Armstrong did not couch his argument in these terms, we note that at first blush, the Legislature's use of the phrase "specific intent" in SDCL 22-22-45 may seem to imply that an actual intent to commit a further felony sex offense is necessary. *See* SDCL 22-22-45 ("Any person who has been convicted of a felony sex offense as defined in § 22-24B-1 who directly threatens or communicates *specific intent* to commit further felony sex offenses is guilty of threatening to commit a sexual offense." (Emphasis added.)). But once the phrase is read in context, the proper interpretation becomes apparent. SDCL 22-22-45 criminalizes the *act of communicating* an intent to commit a further felony sex offense, regardless of whether one has such an intent. Therefore, the use of the phrase "specific intent" following the term "communicates" "does not designate an additional mental state beyond that accompanying the act." *See Huber*, 356 N.W.2d at 473. Rather, the phrase "specific intent," as used in SDCL 22-22-45, goes to the *type of communication* prohibited.

[¶30.] Nevertheless, Armstrong contends that the circuit court erred in refusing his requested instruction, which he characterizes as an "instruction on specific intent." We disagree. The circuit court properly refused Armstrong's instruction because it incorrectly suggested that the crime of threatening to commit further sexual offenses is a specific intent crime, a term of art which should only be used with respect to crimes that, unlike here, require some intent or purpose beyond the intent to do the physical act that the crime requires. In addition, the court properly refused Armstrong's instruction as an incorrect statement of the law because it required a finding that he acted with the "specific design or purpose to

threaten C.H." when nothing in the text of SDCL 22-22-45 requires that a threat be directed to a *particular person*. *Compare* SDCL 22-22-45 (referencing only a threat to commit a further sex offense), *with* SDCL 22-11-15 (requiring a threat to be uttered or addressed "to any judicial or ministerial officer").

[¶31.]     Armstrong's further argument that the circuit court's general intent instruction was insufficient is based upon his incorrect assertion that SDCL 22-22-45 is a specific intent crime. However, we note that the circuit court actually gave two instructions on intent. While the first was the pattern jury instruction requiring general criminal intent, the second instruction further informed the jury as to a particular mental state that the State must prove to find Armstrong guilty under SDCL 22-22-45.[3] Neither Armstrong nor the State objected to the court's second instruction.

---

3.     The circuit court's two intent instructions provided as follows:

Instruction No. 19

In the crime of Threatening to Commit a Sexual Offense, the defendant must have criminal intent. To constitute criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does an act which the law declares to be a crime, the person is acting with criminal intent, even though the person may not know that the conduct is unlawful.

Instruction No. 20

The State must prove that the defendant intended to issue a threat or knew that his communications would be viewed as a threat. The intent with which the act was done is shown by the circumstances surrounding the act, the manner in which it was done, and the means used.

[¶32.]    Notably, nothing in the text of SDCL 22-22-45 indicates a required mental state.  Nor has this Court previously examined the precise issue of what mental state the communicator of a threat must have in order to be convicted under this statute (or under other South Dakota statutes criminalizing the communication of threats).[4]  During the settling of the instructions relating to intent, the circuit court referred to *Elonis v. United States*, a case in which the United States Supreme Court similarly addressed the question of what mental state is required by a federal statute prohibiting "any communication containing any threat . . . to injure the person of another[.]"  575 U.S. 723, ___, 135 S. Ct. 2001, 2004, 192 L. Ed. 2d 1 (2015) (quoting 18 U.S.C. § 875(c)).

[¶33.]    In *Elonis*, neither the defendant nor the government had "identified any indication of a particular mental state requirement in the text of" the federal statute.  *Id.* at ___, 135 S. Ct. at 2008–09.  However, the Court recognized "[t]he fact that [a] statute does not specify any required mental state . . . does not mean that none exists" because generally "a guilty mind is 'a necessary element in the indictment and proof of every crime.'"  *Id.* (quoting *United States v. Balint*, 258 U.S. 250, 251, 42 S. Ct. 301, 302, 66 L. Ed. 2d 604 (1992)).  Further, "a defendant generally must 'know the facts that make his conduct fit the definition of the offense[.]'"[5]  *Id.* at ___, 135 S. Ct. at 2009 (quoting *Staples v. United States*, 511 U.S.

---

4.    *Paulsen, Draskovich,* and *Austad* all addressed First Amendment defenses in cases involving threats, rather than the required mental state for each alleged offender.

5.    We came to the same conclusion in *State v. Jones*, 2011 S.D. 60, 804 N.W.2d 409.  In *Jones*, we read a knowledge requirement into the crime of third-

(continued . . .)

600, 608 n.3, 114 S. Ct. 1793, 1798 n.3, 128 L. Ed. 2d 608 (1994)). Therefore, the Court held that it is necessary to read a *mens rea* into statutes that are silent as to the required mental state, but "only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Id.* at ___, 135 S. Ct. at 2010 (citation omitted).

[¶34.] In regard to the *mens rea* required under 18 U.S.C. § 875(c), the Court disagreed with the defendant's argument that the various definitions of the word "threat" encompass an intent to inflict harm. *Id.* at ___, 135 S. Ct. at 2008. Rather, the Court noted that these various definitions "speak to what the statement conveys—not to the mental state of the author." *Id.* "For example, an anonymous letter that says 'I'm going to kill you' is 'an expression of an intention to inflict loss or harm' regardless of the author's intent. A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke." *Id.*

[¶35.] After observing that the federal statute required "proof that a communication was transmitted and that it contained a threat[,]" the Court identified "the crucial element separating legal innocence from wrongful conduct" as "the threatening nature of the communication." *Id.* at ___, 135 S. Ct. at 2011 (citation omitted). Ultimately, the Court found that the mental state requirement is satisfied if a "defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.*

---

(. . . continued)
degree rape under SDCL 22-22-1(4), even though the statute was silent as to *mens rea. Id.* ¶ 15, 804 N.W.2d at 414.

at ___, 135 S. Ct. at 2012. However, the Court specifically declined to decide "whether recklessness suffices for liability" under the federal law at issue because neither the defendant nor the government "briefed or argued that point" and because none of the lower courts had yet addressed that question. *Id.* at ___, 135 S. Ct. at 2012–13.

[¶36.] Here, the crucial element in SDCL 22-22-45 separating legal innocence from wrongful conduct, like the federal statute interpreted in *Elonis*, is the threatening nature of the communication. Thus, we find the Court's rationale in *Elonis* to be persuasive and similarly conclude that SDCL 22-22-45 requires a *mens rea* beyond what the Court in *Elonis* characterized (and rejected) as essentially a negligence standard, i.e., whether a reasonable person would consider his or her communication to be a threat. However, it is very difficult to discern the proper label for a required mental state beyond negligence when applying our statutory definitions of "knowing" and "reckless" to the context of a communication. A person who is "aware that the facts exist which bring the act . . . within the provisions of any statute" has acted "knowingly." SDCL 22-1-2(1)(c). In regard to a threat, therefore, "knowingly" means that a person must have an awareness that he or she has issued a communication in a context wherein a reasonable person would interpret it as a serious expression of an intent to injure. *See Draskovich,* 2017 S.D. 76, ¶ 18, 904 N.W.2d at 764 (defining what constitutes a threat). But the word "recklessly" connotes a similar mental state, namely "a conscious and unjustifiable

disregard of a substantial risk that [one's] conduct may cause a certain result or may be of a certain nature." SDCL 22-1-2(1)(d).[6]

[¶37.] We further note that the negligence standard rejected by the Court in *Elonis* aligns with the test for determining whether a communication is a "true threat" such that it is not protected by the First Amendment. The interplay between what is required to overcome a First Amendment challenge and what is required to meet the elements of a particular statute criminalizing threatening speech can admittedly be confusing. The former is centered upon the effect of the communication on the recipient, while the latter requires an analysis of an additional factor—the intent of the author. This additional factor requires proof that the author knew that the communication is threatening in nature, and inherent in that knowledge is an understanding of the effect such a communication will have on its recipient. As one federal district court aptly explained: these two tests apply in tandem such that "the defendant must be subjectively aware that his

---

6.      It can become an exercise in hair-splitting to differentiate between "knowing" and "reckless" conduct. *Compare Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011–12 (majority employing a knowledge requirement and referring to "whether a defendant knew the *character* of what was sent," or stated somewhat differently, "with knowledge that the communication will be viewed as a threat"), *with Elonis*, 575 U.S. at ___, 135 S. Ct. at 2015 (Alito, J., concurring in part) (utilizing a recklessness standard, namely whether a defendant "is aware that others could regard his statements as a threat"), *and Elonis*, 575 U.S. at ___, 135 S. Ct. at 2018 (Thomas, J., dissenting) (concluding the statute requires only general intent, i.e., a defendant who "knew the words used in [the] communication, and understood the ordinary meaning of those words in the relevant context"). While reasonable minds can differ as to which *label* is more appropriate, we, like the Court in *Elonis*, leave that determination for another day, if and when it is squarely presented.

conduct is objectively intimidating." *United States v. Carr*, 314 F.Supp.3d 272, 281, n.12 (D.D.C. 2018).

[¶38.]     Finally, our statutes criminalizing other types of threats support our conclusion that a mental state beyond negligence is required under SDCL 22-22-45. Several of these statutes require a knowing and intentional mental state. For example, under SDCL 22-11-15.2, a defendant must "knowingly and intentionally" convey a threat to a constitutional officer or the officer's immediate family. *See also* SDCL 22-11-15.5, -15.6 (requiring that a defendant "knowingly and intentionally" convey a threat to a law enforcement officer or the officer's family); SDCL 22-11-31 (prohibiting harassment by sending or delivering a threatening communication simulating fraudulent legal proceedings; "harasses" for purposes of this statute is defined in SDCL 22-11-32 as "a knowing and willful course of conduct directed at any person which seriously alarms or annoys the person and which serves no legitimate legal purpose").

[¶39.]     Other statutes require a "specific intent" in the true sense of this term because they require an intent beyond the intent to communicate a threat. For example, under SDCL 22-11-15, the threat must be uttered, addressed, or communicated "*with the intent* to induce the person either to do any act not authorized by law, or to omit or delay the performance of any duty imposed upon the person by law, or for having performed any duty imposed upon the person by law[.]" (Emphasis added.) Likewise, SDCL 22-19A-1(2) prohibits the making of "a credible threat to another person *with the intent* to place that person in reasonable fear of death or great bodily injury[.]" (Emphasis added.) *See also* SDCL 22-11-19

(prohibiting any person from witness tampering by, among other things, threatening to injure any person or property with an intent to induce a witness in an official proceeding to testify falsely, withhold evidence, or elude process).

[¶40.] In comparison to these other threat statutes, SDCL 22-22-45 does not specify any particular mental state that must accompany the physical act the crime requires, i.e., the direct threat or communication of a threat to commit a sex offense. Nor does it require some intent in addition to the mental state accompanying the physical act. Contrary to Armstrong's suggestion, we decline to read a specific intent requirement into a statute that is silent as to the required mental state. We thus read into SDCL 22-22-45 only the intent necessary to separate speech deemed criminal from that which is not.

[¶41.] Therefore, in order to be convicted under SDCL 22-22-45, a defendant must have an intention to do the physical act (directly threaten or communicate a specific intent to commit a further felony sex offense), along with the knowledge that the nature of the communication and the context in which it is communicated is such that a reasonable recipient would perceive it as a threat. An instruction based upon this directive, unlike the instruction found to be erroneous in *Elonis*, applies an objective (reasonable person) standard to the *recipient* of the communication, rather than to the *defendant*, who must instead have subjective knowledge of the character of the communication.[7] While the majority opinion in

---

7. The jury instruction rejected in *Elonis* provided:

> A statement is a true threat when a defendant intentionally
> makes a statement in a context or under such circumstances

(continued . . .)

*Elonis* likewise centered upon the necessity of having knowledge of the *character* of a communication, the language of the Court's ultimate conclusion seemed to go one step further by requiring knowledge that the communication "*will be viewed* as a threat." 575 U.S. at \_\_\_, 135 S. Ct. at 2012 (emphasis added). This language implies that a defendant must have knowledge that the actual recipient will in fact view the communication as a threat. Because it is impossible for any defendant to know with certainty how a communication will be viewed by its actual recipient, we decline to adopt these precise terms. The circuit court's Instruction No. 20, while generally aligned with our directive here, was similar to the instruction in *Elonis* because it required a finding that Armstrong "knew that his communication would be viewed as a threat." If anything, this instruction imposed a more onerous burden on the State than necessary. Therefore, because Armstrong cannot maintain that he was in any way prejudiced by the court's instructions, we find no reversible error in this case. *See State v. Spaniol*, 2017 S.D. 20, ¶ 49, 895 N.W.2d 329, 346 (indicating that reversible error requires that the instruction be both erroneous and prejudicial).

[¶42.] Affirmed.

[¶43.] GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.

---

(. . . continued)

> wherein *a reasonable person would foresee that the statement would be interpreted* by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.

575 U.S. at \_\_\_, 135 S. Ct. at 2007 (emphasis added).