#29289-r-SPM
**2021 S.D. 39**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE PEOPLE OF THE STATE OF SOUTH DAKOTA
IN THE INTEREST OF I.T.B., DELINQUENT CHILD,
and Concerning T.J.B. (Father) and C.B. (Mother),
RESPONDENTS.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KENT SHELTON
Judge

* * * *

TUCKER J. VOLESKY of
Volesky Law Firm
Huron, South Dakota                          Attorneys for child and
                                             appellant.


JASON R. RAVNSBORG
Attorney General

JONATHAN K. VAN PATTEN
Assistant Attorney General
Pierre, South Dakota                         Attorneys for petitioner and
                                             appellee.


* * * *

CONSIDERED ON BRIEFS
FEBRUARY 17, 2021
OPINION FILED **07/07/21**

#29289

MYREN, Justice

[¶1.]       The circuit court adjudicated I.T.B. a delinquent child for engaging in conduct that constituted the offense of making a terrorist threat in violation of SDCL 22-8-13(1).  We reverse.

## Facts and Procedural History

[¶2.]       During the high school's lunch period on January 30, 2020, Principal Mike Radke (Principal Radke) sent I.T.B., a fifteen-year-old student, to the principal's office because he was "egging on" a student who was having a behavioral issue.  When I.T.B. arrived at the principal's office, Romana Olivo (Olivo), the high school's administrative assistant, invited I.T.B. to have a seat.  Instead, he sat on the floor and then laid on the floor.  When Olivo asked him to get up, I.T.B. complied but began pacing in and out of the office and interacting with students in the hall.  Olivo testified to the events as follows:

> Q: Did you hear any of the things that he was saying or conversing with the students?
>
> A: Yes.  I don't think any of the students were paying attention. One of the things I heard as he was walking in and out, one of the words was bomb.  And I'm not sure what he said, I just heard the word bomb.
> Another of the words that he used was killing someone.  And at that time, he had already come back in and grabbed the scissors that we have in the office and he said I could just kill someone. And he was laughing and he sa[id] I'm just kidding.  And he set them back down and he went and sat back down.
> And he got up again and he was back out again.  And then he came back and he was laying on the floor again.  It was just continual.  I've never seen him like that.
>
> . . .
>
> Q: So at one point, he was holding the scissors; and while laughing, talking about essentially killing someone?

-1-

A: Yes, and he kind of turned towards the hallway. (Indicating.) And that was one of the instances he had the scissors.

Q: And the other statement that you overheard was something to do with a bomb?

A: Yes.

Q: But you're not sure who, if anyone, he was talking to or if he was just kind of talking?

A: He was just talking. There wasn't anybody he was specifically saying that to.

[¶3.] On cross-examination, Olivo further elaborated regarding I.T.B.'s behavior that day:

Q: Now, you came [sic] he said the word bomb at some point?

A: He did.

Q: But you don't know how he used it; do you?

A: I don't remember.

Q: And you don't know what his intent was; do you?

A: No. Because at that point, he had stuck his arms up and was sticking his head out of the office door saying something to them. And the only word I heard was bomb.

Q: So you don't know the context?

A: No, I don't know the context of that.

Q: Now, you also claim that you heard [I.T.B.] say kill at some point?

A: He said that more than once.

Q: But you don't know how he used it do you?

A: Yes

Q: How was that?

A: We have some scissors here. (Indicating.) So at one point, he grabbed the scissors. And he said I should just kill someone or I just want to kill someone. I don't remember the exact words. And then he looked at me, ha-ha, I was just kidding and put them back down.
I don't know who he was looking for. And he went back out again and came back in. And later on, after in and out, he used the word, again, kill. He's like, well, I should just kill someone. He picked up the scissors again. (Indicating.)

Q: So I'm reading from your written statement. It says some of the things he said as he swayed in front of the door, words like bomb in one sentence and later something about killing someone?

A: Yes.

Q: And you go on to say he picked up the scissors and said something about killing someone?

A: Uh-huh.

Q: Again, he said just kidding?

A: Yes.

Q: So you know that he says something about killing somebody, but you don't know who it was directed at?

A: No, it wasn't directed at anyone.

Q: It wasn't directed at anyone?

A: No, he was just in the doorway and watching the kids go by. So there wasn't a specific person that he was directing it at.

. . .

Q: Did you believe [I.T.B.] when he said just kidding?

A: I'm not sure. Yes, I believe him.

[¶4.]     After I.T.B. had been in the office for "twenty to thirty minutes," Principal Radke visited with I.T.B. about not intervening when other students are experiencing behavioral issues and sent I.T.B. back to class. Afterward, Olivo told the assistant principal about I.T.B.'s comments and actions. The assistant principal called the school resource officer Christian Rodacker (Officer Rodacker). Principal Radke summoned I.T.B. back to the principal's office to speak with Officer Rodacker. While waiting in the principal's office for Officer Rodacker to arrive, I.T.B. became upset and left the school grounds.

[¶5.]     Officer Rodacker testified that he received a call from the assistant principal informing him that I.T.B. made a threat at school. Officer Rodacker was familiar with I.T.B. through his work as the school resource officer. Upon arriving at the school and finding I.T.B. gone, he decided to look for I.T.B. to ensure "everything at the school was safe" and "that nothing was going to escalate[.]" The police chief told Officer Rodacker to stay at the school "just in case anything was to happen" and "[c]ollect voluntary statements." Officer Rodacker testified that he took I.T.B.'s threats seriously and further testified, over I.T.B.'s counsel's objection, that "something similar ha[d] happened just a few months prior to this. And one time, okay. But a second time, I felt, like, there was a safety risk - - potential safety risk."[1] However, Officer Rodacker later testified that a threat never materialized, and he never recovered bomb-making materials or weapons.

---

1.     The objection was premised on SDCL 19-19-404(b)(1). The circuit court overruled the objection but did not provide any explanation of its relevance or conduct a Rule 403 balancing. It is well settled that prior to admitting other acts evidence, the court was required to follow a two-step analysis,

(continued . . .)

[¶6.]    In January 2020, the Beadle County State's Attorney filed a petition to declare I.T.B. a delinquent child. The petition alleged one criminal offense—making a terrorist threat under SDCL 22-8-13(1).

[¶7.]    The circuit court held an adjudicatory hearing on February 18, 2020, where Olivo, Principal Radke, Officer Rodacker, and I.T.B. testified. At the end of the adjudicatory hearing, the circuit court stated:

> Based upon the testimony here today, I find that the State has met their burden of proof.[2] That, in fact, [I.T.B.] did threaten a crime of violence, both with the scissors and then in the same time frame talking about a bomb, which is an explosive device. And, I don't think there's any question his intent was to intimidate or coerce someone even if it's just the staff at the high school.

[¶8.]    The circuit court did not enter additional findings of fact or conclusions of law in support of its adjudicatory decision.[3] Furthermore, the circuit court failed

_____

(. . . continued)
   determining whether the evidence is relevant and, if so, whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *State v. Patterson*, 2017 S.D. 64, ¶ 14, 904 N.W.2d 43, 49.

2.    At an adjudicatory hearing, the circuit court is required to determine "whether the allegations of the petition are supported by evidence beyond a reasonable doubt concerning . . . an alleged delinquent child." SDCL 26-7A-82. Here, the circuit court did not specify what burden of proof it applied.

3.    "It is well-settled law that it is the trial court's duty to make required findings of fact, and the failure to do so constitutes reversible error." *Grode v. Grode*, 1996 S.D. 15, ¶ 29, 543 N.W.2d 795, 803. "Findings must be entered 'with sufficient specificity to permit a meaningful review.'" *March v. Thursby*, 2011 S.D. 73, ¶ 20, 806 N.W.2d 239, 244 (quoting *Goeden v. Daum*, 2003 S.D. 91, ¶ 9, 668 N.W.2d 108, 111). "We cannot meaningfully review the trial court [sic] decision without the trial court's reasons for ruling the way it did." *Goeden*, 2003 S.D. 91, ¶ 7, 668 N.W.2d at 110. Therefore, "[c]ircuit courts 'must [e]nsure that findings of fact and conclusions of law are clearly

(continued . . .)

to enter an adjudicatory order. *See* SDCL 26-7A-87 (providing that, in delinquency proceedings, circuit courts "shall issue findings of fact, conclusions of law and an order of adjudication stating the child to be . . . a delinquent child"). On March 5, 2020, after a dispositional hearing, the circuit court entered an order of commitment placing I.T.B. in the custody of the Department of Corrections until he reaches twenty-one years of age.

[¶9.] Although I.T.B. appeals from the circuit court's order of commitment, the three issues raised on appeal pertain to the court's adjudication of I.T.B. as a delinquent child.[4] We need only address the first issue: Whether the evidence is sufficient to support the circuit court's adjudication of I.T.B. as a delinquent child.

**Analysis and Decision**

[¶10.] "This Court reviews the sufficiency of the evidence to support an adjudication of delinquency according to the same standards used in reviewing the sufficiency of the evidence to support a criminal conviction." *In re B.J.T.*, 2005 S.D. 123, ¶ 7, 707 N.W.2d 489, 492. Therefore, our review of "the disposition of a delinquency finding requires us to ensure that 'the State proved each element of the offense beyond a reasonable doubt.'" *In re C.C.H.*, 2002 S.D. 113, ¶ 8, 651 N.W.2d 702, 705 (citations omitted). "In reviewing the sufficiency of the evidence, we

---

(. . . continued)
entered.'" *Donat v. Johnson*, 2015 S.D. 16, ¶ 14 n.4, 862 N.W.2d 122, 128 n.4 (quoting *Goeden*, 2003 S.D. 91, ¶ 9, 668 N.W.2d at 111).

4. I.T.B. also asserted that the circuit court abused its discretion by admitting alleged other acts evidence and that his comments were protected speech under the First Amendment. We need not address these issues because we reverse on other grounds.

determine 'whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt.'" *In re S.J.N-K.*, 2002 S.D. 70, ¶ 8, 647 N.W.2d 707, 710 (citations omitted).

[¶11.] The circuit court adjudicated I.T.B. a delinquent child for making a terrorist threat in violation of SDCL 22-8-13(1), which provides in relevant part:

> Any person who threatens to commit a crime of violence, as defined by subdivision 22-1-2(9), or an act dangerous to human life involving any use of chemical, biological, or radioactive material, or any explosive or destructive device, with the intent to: (1) Intimidate or coerce a civilian population[.]

[¶12.] To establish a terroristic threat, the State was required to prove: (1) I.T.B. threatened a "crime of violence" as defined in SDCL 22-1-2(9),[5] or threatened to commit an act dangerous to human life involving any use of chemical, biological, or radioactive material, or any explosive or destructive device, and (2) that he did so with the intent to intimidate or coerce a civilian population. Because of the circuit court's brevity and the absence of any additional findings of fact or conclusions of law, it is not clear whether the court found I.T.B. threatened to commit a crime of violence or an act dangerous to human life, or both. In the court's oral ruling, the court found that I.T.B. threatened to commit a crime of violence, referring to both

---

5. SDCL 22-1-2(9) defines a "crime of violence" as:

> any of the following crimes or an attempt to commit, or a conspiracy to commit, or a solicitation to commit any of the following crimes: murder, manslaughter, rape, aggravated assault, riot, robbery, burglary in the first degree, arson, kidnapping, felony sexual contact as defined in § 22-22-7, felony child abuse as defined in § 26-10-1, or any other felony in the commission of which the perpetrator used force, or was armed with a dangerous weapon, or used any explosive or destructive device[.]

the scissors and I.T.B.'s statement about a bomb, and further noted that a bomb is an "explosive device." The court also found that I.T.B.'s "intent was to intimidate or coerce someone even if it's just the staff at the high school."

[¶13.]     Our task on review is to determine whether either of the two acts identified by the court were sufficient to support the circuit court's conclusion that I.T.B. made a terrorist threat as defined in SDCL 22-8-13(1).

### A.     I.T.B. uttering the word "bomb"

[¶14.]     A review of the record reveals Olivo heard only one word—"bomb." She testified that she did not hear the context in which I.T.B. used it, and she did not think any of the students passing by paid attention to what I.T.B. was saying. Olivo explained that I.T.B. was just talking as he was walking in and out of the office. The State presented no other witnesses who heard I.T.B. utter the word "bomb."[6] Officer Rodacker testified that he found no explosive devices at the school, and no further escalation of the events occurred. At best, the State's evidence supports a factual finding that I.T.B. said the word "bomb" within earshot of other students. Such an utterance, without further context, is insufficient to support a determination beyond a reasonable doubt that I.T.B. threatened to commit a "crime of violence" or an "act dangerous to human life involving . . . any explosive device"

---

6.     Whether the threat was heard by its intended recipients is not a per se element of the crime of making a terrorist threat. However, such a fact relating to the context in which a statement is made may be relevant evidence bearing on the speaker's intent. The crime of making a terrorist threat is a specific intent crime because it requires an "intent or purpose beyond the intent to do the physical act which the crime requires." *State v. Armstrong*, 2020 S.D. 6, ¶ 30, 939 N.W.2d 9, 16. Relevant here, the specific intent charged was an intent to intimidate a civilian population.

with the intent to intimidate or coerce a civilian population, as required by SDCL 22-8-13(1).

    B.  *I.T.B. uttering the phrase "kill someone" while holding a pair of scissors*

[¶15.]  Olivo was uncertain as to precisely what I.T.B. said regarding the scissors. She testified that, while I.T.B. was in the office, he picked up the scissors and said either "kill someone" or "I should just kill someone" or "I just want to kill someone" or "I feel like killing someone."

[¶16.]  A pair of scissors can constitute a dangerous weapon, depending on the circumstances in which an individual uses it. However, from our review of the record, Olivo is the only person who heard the remarks I.T.B. made while holding the scissors. She testified that I.T.B. did not direct these statements at her or any other person—he was just talking. She could not remember precisely how I.T.B. phrased his statement. After hearing the "threat," she did not immediately remove the scissors from I.T.B.'s reach, and Olivo testified that she believed I.T.B. when he said he was "just kidding." At best, the evidence supports only a factual finding that, while holding a pair of scissors, I.T.B. uttered the words "kill someone" and that his words were not directed at any specific person. While statements such as these could, under some circumstances, constitute a threat to commit a crime of violence (e.g., an aggravated assault or another felony while armed with a dangerous weapon), in order to conclude that I.T.B. made a terrorist threat, the evidence must support a determination that I.T.B. uttered them with the intent to intimidate or coerce *a civilian population* as required by SDCL 22-8-13(1).

[¶17.] This Court has not before examined what is meant by "a civilian population." In *People v. Morales*, the New York Court of Appeals examined the meaning of the phrase "intent to intimidate or coerce a civilian population," noting that "civilian population" could "encompass a variety of communities depending on how the relevant 'area' is defined and who lives within that territory." 982 N.E.2d 580, 584 (N.Y. 2012). However, the court noted that "the concept of terrorism has a unique meaning and its implications risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act." *Id.* at 586.

[¶18.] In concluding that I.T.B. had made a terrorist threat, the circuit court did not specifically identify a "civilian population" that I.T.B. intended to intimidate when he made his statements. Rather, the court found that I.T.B. acted with the intent to intimidate "someone even if it's just the staff at the high school." On appeal, the State claims that the circuit court was referring to all of the staff at the high school and that such group of people is sufficient to constitute a "civilian population." On the contrary, it is clear from the record that the statement at issue referred only to killing some unidentified person, not a group, and it was made in the presence of only one person—Olivo. Therefore, while *Morales* and decisions by other courts further address what types of groups constitute a "civilian population," we need not make that determination here because the term "population" plainly requires an intent to coerce or intimidate more than one person, and the evidence is clearly not sufficient to support such a finding.

[¶19.]     Because the evidence in the record is insufficient to support a determination that either of I.T.B.'s statements constitute a terroristic threat, we reverse the circuit court's adjudication of I.T.B. as a delinquent child.

[¶20.]     JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.