#28800-a-PJD
**2020 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

ROGER L. JACKSON,                               Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JANE WIPF PFEIFLE
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

SARAH L. LARSON
Assistant Attorney General
Pierre, South Dakota                            Attorneys for plaintiff and
                                                appellee.


ALECIA E. FULLER of
Pennington County Public
   Defender's Office
Rapid City, South Dakota                        Attorneys for defendant and
                                                appellant.

* * * *

ARGUED
FEBRUARY 11, 2020
OPINION FILED **09/16/20**

#28800

DEVANEY, Justice

[¶1.]     A jury found Roger Jackson guilty of third-degree rape in violation of

SDCL 22-22-1(3), which makes it a crime for any person to sexually penetrate a

victim incapable of giving consent because of physical or mental incapacity.

Jackson appeals, contending that the State violated his right to due process by

failing to interview the victim.  He further asserts that the circuit court erred in

determining that knowledge is not an element of the offense and abused its

discretion in restricting his expert's testimony and in denying his motion for a

continuance.  We affirm.

### Factual and Procedural Background

[¶2.]     In 2012, K.S. was diagnosed with Benson's Syndrome, a rare form of

dementia that affects her verbal, visual, and motor skills.  K.S. was 52 years old at

the time.  She and her husband, Mark, have three adult children.  Not long after

her diagnosis, K.S.'s disease progressed to the point that she could not safely

continue living at home.  Her family then decided she needed the additional care

that could be provided at Holiday Hills, an assisted living center.  K.S. lived at

Holiday Hills for approximately three years until her disease worsened.  She had

lost the ability to control her body, would lose her balance, and needed assistance

with eating, getting dressed, and going to the bathroom.  K.S. also struggled to

control her bodily functions and had to wear an adult diaper.

[¶3.]     In October 2016, K.S.'s family moved her to Bella Vista, a 24-hour care

facility for people with dementia.  Upon her arrival, Dr. Priscilla Bade, Bella Vista's

medical director, evaluated K.S.  This evaluation occurred less than one month

-1-

before the charged offense. Dr. Bade testified that during the evaluation, K.S. answered questions but she "had some difficulty finding the right words." K.S. needed step-by-step verbal cues and help with eating. Further, she had trouble understanding what she was seeing and had issues with incontinence and falling. Dr. Bade ordered that K.S. receive rehabilitative therapies (occupational, speech, and physical) to help her learn to do things for herself as best as she could.

[¶4.]        Shortly after K.S. began residing at Bella Vista, her family noticed that a man named Roger Jackson would visit her. Jackson later explained that he had met K.S. at Holiday Hills when he and his friends were at the facility to play music for the residents. Jackson related that K.S. enjoyed the music and the two danced, and that after she moved to Bella Vista, he would play music for her and read her the Bible. He also brought her small gifts. While K.S.'s family allowed Jackson to visit her, Mark was suspicious of Jackson's intentions. Mark had a conversation with Jackson at Bella Vista in which he explained K.S.'s condition and told Jackson that he "can visit and play music and that is it." Mark also explicitly told Jackson that he could never take her out of the facility and informed staff at Bella Vista of this directive.

[¶5.]        Mark and Kaia, K.S.'s daughter, visited K.S. regularly at Bella Vista, although both testified that she did not always recognize them. Usually, Kaia and Mark would not leave town at the same time so that at least one person would be available for K.S. However, they were both scheduled to be out of town the weekend of November 18, 2016. Kaia testified that during a visit with her mother prior to leaving town, Jackson was there and asked her if he could take K.S. on an

outing over the weekend to get her hair done. Kaia informed him that only family members are allowed to take K.S. outside the facility.

[¶6.]     Despite Kaia's directive, Jackson took K.S. out of Bella Vista on November 18. Bella Vista nurse, Stacy Kilber, later explained that she was unaware that K.S. had left the facility with Jackson because Jackson left with her when Kilber and the aides were tending to another resident. When she realized that K.S. was not in her room and could not be located, Kilber called one of the facility's alert codes, and staff members began looking for K.S. While they were searching, Jackson and K.S. walked into the facility. They had been gone for approximately two hours. After K.S. was returned to her room, Heather Anderson, the director of nursing, instructed staff to assess her from head to toe.

[¶7.]     During the assessment, Bella Vista staff found what appeared to be discharge in K.S.'s adult diaper. Nurse Kilber also asked her questions, such as: "Are you safe?"; "Do you feel okay?"; and "Are you having any pain right now?" Kilber later testified that she did not believe K.S. understood why she was being examined. Kilber explained that while K.S. could communicate, "she wasn't answering the questions that related to what [Kilber] was asking." Nonetheless, when Kilber asked K.S. where she had been, K.S. responded, "Where we always go. To the school." Kilber also related that she specifically asked K.S. if she had engaged in any sexual contact and K.S. responded, "I don't think I would do that." Staff collected K.S.'s clothing, and Kilber documented her examination of K.S., including her answers to Kilber's questions.

[¶8.]    Meanwhile, Kaia received a call from law enforcement advising her that her mother had been located.  Because she was not aware that her mother had been missing, Kaia contacted her father.  They soon found out from staff at Bella Vista that K.S. had left the facility with Jackson, and that upon her return, a nurse found discharge in K.S.'s undergarment.

[¶9.]    Kaia used to work as a police officer for the Rapid City Police Department.  On November 19, 2016, the day after Jackson's outing with K.S., she contacted Sergeant Asscherick to explain what had occurred with her mother.  Sergeant Asscherick assigned Officer Chad Strobel to report to Bella Vista with his training officer, Officer Daniel Anderson.  Officer Anderson and Kaia were friends and Anderson had met K.S. before, so he knew a little bit about K.S.'s mental state.  Kaia provided information about Jackson and K.S.'s relationship to Officer Anderson by phone while the officers were en route to Bella Vista.

[¶10.]    While at Bella Vista, neither of the officers asked K.S. any questions, but Officer Strobel spoke to staff members and obtained additional information regarding K.S.  He testified that he understood K.S. would undergo a sexual assault examination at the hospital where additional information would be gathered.

[¶11.]    Later that same day, the Bella Vista nursing director took K.S. to the hospital emergency room to complete a sexual assault examination.  Kaia, as K.S.'s power of attorney, provided consent for K.S. to undergo the examination and also provided limited information to hospital staff regarding K.S.'s disease and the reason for the examination.  Nicole Weyer, a trained nurse and member of the sexual assault response team, performed the examination.  She explained that she

began by asking K.S. demographic-type questions. According to Weyer, K.S. answered some of the preliminary questions, but when asked questions concerning the assault, she was unable to answer so Weyer marked "unsure" for these responses. During the physical examination of K.S., Weyer observed redness on the inner sides of her vagina.

[¶12.] Dr. Bade also assessed K.S. on November 19 at Bella Vista. Dr. Bade related that while K.S. could not give any details about the outing, she smiled and said that she had fun. However, Dr. Bade explained that K.S.'s communication was disjointed. "[S]he'd be talking but not with a lot of meaning to it. She only - - she didn't know exactly where she was."

[¶13.] Investigator Mischelle Boal was assigned to the case on November 21, 2016. Although she did not interview K.S., she spoke with Kaia and Mark. She also interviewed Jackson, who at the time was 70 years old. Jackson described how he knows K.S. and claimed that K.S. considers him to be her boyfriend, even though she is married. He denied that the two had an intimate relationship, explaining that he is impotent. Jackson agreed that he was told by the family not to take K.S. out of the facility, but explained that he took her out anyway because she wanted to get some fresh air. Jackson related that he took K.S. for a drive around a local park and then into the hills, and that they also walked around downtown. He denied having any sexual contact with K.S. and claimed that he would never take advantage of her. Jackson told Investigator Boal that he "feel[s] for her" because she is "[i]n a nursing home and doesn't understand." He agreed to provide a DNA sample.

[¶14.] Investigator Boal met with Jackson again in February 2017 after receiving the DNA test results. She informed him that seminal fluid had been found in K.S.'s undergarment and that the DNA testing showed that K.S.'s husband could be excluded as the source of the fluid, but Jackson could not. Initially, Jackson had no explanation for how his seminal fluid got into K.S.'s undergarment, but then stated that while they were dancing in her room, K.S. initiated a sexual encounter. According to Jackson, K.S. took her clothes off and went into the bathroom, where he followed and "tried to make love to" her. Jackson stated that he tried to put his penis inside K.S.'s vagina, but "didn't think anything happened" because he is impotent. He further admitted that he put his fingers inside her vagina and that he stopped because he "heard something down the hallway[.]" Jackson explained that K.S. then put her Depends underwear back on, and after that, he took her out of Bella Vista.

[¶15.] A grand jury indicted Jackson on March 15, 2017, on one count of third-degree rape in violation of SDCL 22-22-1(3), alleging that Jackson engaged in an act of sexual penetration with a victim incapable of consenting because of physical or mental incapacity. Jackson pled not guilty. Prior to trial, Jackson filed a motion to have the circuit court determine whether knowledge is an element of the offense. The court denied the motion based on our decision in *State v. Schuster*, 502 N.W.2d 565 (S.D. 1993), holding that knowledge is not an element of rape of a person incapable of giving consent because of physical or mental incapacity.

[¶16.] Jackson also filed two motions to dismiss the indictment, but only the second motion is relevant here. Jackson requested that the court dismiss the

indictment, claiming that the State's failure to interview K.S.—the only other witness to the alleged offense—caused the loss of material exculpatory evidence of K.S.'s capacity to consent to an act of sexual penetration on the date in question. Jackson requested an evidentiary hearing on the motion, which the court denied. The court also declined to dismiss the indictment, finding no due process violation, but noting that law enforcement's failure to interview K.S. was nonetheless "fertile ground for cross-examination[.]"

[¶17.]     Also prior to trial, the State and the defense both objected to each other's proffered expert testimony, and the court scheduled a *Daubert* hearing on the objections. Jackson asserted that the State's proffered testimony from Dr. Scott Cherry about his *March 2018* evaluation of K.S. was not relevant to whether K.S. was capable of consenting to an act of sexual penetration *on November 18, 2016.* Jackson further objected to any opinion by Dr. Cherry on K.S.'s capacity to consent on the date of the offense because the State had not provided a report relating such an opinion. In a similar vein, the State objected to Jackson's proffered expert testimony from Dr. Rodney Swenson that "*no information exists* regarding [K.S.'s] specific capacity to give consent with respect to this sexual encounter because she was not questioned about what she understood happened in this encounter." (Emphasis added.) According to the State, Dr. Swenson, in essence, had no opinion and therefore his testimony would not assist the jury.

[¶18.]     Prior to the *Daubert* hearing, the State withdrew its intent to call Dr. Cherry, indicating that because the relevant inquiry is whether K.S. had the capacity to consent *at the time of the offense* and not her present mental capacity, it

"won't then broach that subject with [Dr. Cherry]." Therefore, the *Daubert* hearing concerned only the State's objections to Dr. Swenson's testimony. After considering the testimony provided by Dr. Swenson at the hearing, the court held that Dr. Swenson could "testify about what he understands Benson's [Syndrome] to be," and about his view that K.S.'s mental capacity "perhaps wasn't as bad as the State suggests[.]" The court further determined that Dr. Swenson could testify about "what he found in the medical records" and to his *inability* to give an opinion as to her capacity to consent on the date in question. However, the court held that Dr. Swenson could not testify that he would have been able to give an opinion on K.S.'s physical or mental incapacity to consent on November 18, 2016, had K.S. been asked certain questions on that evening or within a few days.

[¶19.]   Three days before trial, Jackson filed a motion for a continuance, citing the need to schedule a new trial on a date when Dr. Cherry would be available to testify as a defense witness. Defense counsel asserted that the State had failed to turn over exculpatory evidence, namely that Dr. Cherry held an opinion similar to Dr. Swenson's, i.e., that he could not opine on K.S.'s capacity to consent on November 18, 2016, because he did not assess K.S. on that date. The State objected to a continuance, arguing, in part, that Dr. Cherry's inability to render an opinion was not exculpatory. The court agreed, and also found the proffered testimony to be cumulative. The court denied the motion for a continuance.

[¶20.]   The five-day trial began on June 25, 2018. Mark, Kaia, and K.S.'s medical care providers testified regarding K.S.'s mental and physical condition on and near November 18, 2016. On the second day of trial, Jackson requested the

court reconsider its prior ruling confining witness testimony about K.S.'s capacity to the October to November 2016 timeframe. In his view, the inability to question witnesses about K.S., both before and after this limited timeframe, prevented him from supporting his claim that K.S. demonstrated lucidity on occasions and that she may have shown some improvement in areas associated with the therapy she had been receiving after being admitted to Bella Vista. Jackson also highlighted that K.S.'s husband, Mark, had been allowed to testify about events associated with her condition occurring long before October 2016. The court declined to reconsider its previous ruling regarding the relevant timeframes.

[¶21.] Jackson called Dr. Swenson, who testified that after reviewing the investigative reports and medical records, he did not "find anything that helped [him] understand whether or not the event that we're talking about here was a consensual act between two adults or whether it was a coercive act." In his view, K.S. could have been interviewed shortly after the incident even though she has Benson's Syndrome because her medical records suggest that she was able to provide information. The State objected to the phrasing of certain questions asked of Dr. Swenson. After considering arguments of counsel outside the presence of the jury, the court allowed defense counsel to ask him the following question relating to K.S.'s capacity to consent: "[A]fter consideration of the medical records, the police reports, the other statements[,] as well as your expertise[,] do you have an opinion as to whether [K.S.] had the capacity to consent on November 18, 2016?" Dr. Swenson replied, "My opinion is that no information exists regarding [K.S.'s]

specific capacity to give consent because she was not questioned about what she understood happened."

[¶22.]        The jury found Jackson guilty of third-degree rape in violation of SDCL 22-22-1(3).  The circuit court sentenced Jackson to fifteen years in the penitentiary with five years suspended.  Jackson appeals, asserting the following issues for our review.

1.    Whether the circuit court erred when it denied Jackson's motion to dismiss.

2.    Whether the circuit court erred when it determined that knowledge is not an element of SDCL 22-22-1(3).

3.    Whether the circuit court abused its discretion in restricting Dr. Swenson's testimony.

4.    Whether the circuit court abused its discretion when it denied Jackson's motion for a continuance.

## Analysis and Decision

### 1. Whether the circuit court erred when it denied Jackson's motion to dismiss.

[¶23.]        Jackson argues that the circuit court erred in denying his motion to dismiss the indictment, which was based on his claim that the State violated his right to due process in failing to interview K.S. on November 18, 2016, or shortly thereafter.[1]  In Jackson's view, a timely interview of K.S. would have produced

---

1.    The State's brief does not respond to Jackson's due process argument. Rather, the State contends that the circuit court properly denied the motion to dismiss because Jackson failed to cite one of the nine grounds for dismissal of an indictment under SDCL 23A-8-2.  However, Jackson filed two motions to dismiss—one based on statutory grounds, and one based on a due process argument.  While both motions were denied by the court, it is the court's denial of the latter due process motion that Jackson has appealed.

exculpatory and material evidence; therefore, the failure to investigate irreparably prejudiced his ability to obtain a fair trial. He also contends that the circuit court did not have sufficient evidence to decide the motion without holding an evidentiary hearing.

[¶24.]    A defendant has a constitutional right to due process, namely a criminal prosecution that "comport[s] with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984). To be sure, the United States Supreme Court has "long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Id.* Further, "[t]o safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 3447, 73 L. Ed. 2d 1193 (1982)).

[¶25.]    In *Valenzuela-Bernal*, the United States Supreme Court examined whether an indictment should be dismissed when the government deports witnesses before the defense has had an opportunity to interview those witnesses and the witness testimony could conceivably benefit the defendant. 458 U.S. at 863, 866, 102 S. Ct. at 3444, 3446. Relying on *Brady v. Maryland*, the Court recognized "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 868, 102 U.S. at 3447 (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d

215 (1963)). The court declined to dispense with the materiality requirement even though the deportation of witnesses meant the defendant "simply had no access to the witnesses." *Id.* at 870, 102 S. Ct. at 3448.

[¶26.]     In *Trombetta*, the United States Supreme Court again examined the concept of constitutionally guaranteed access to evidence, and more specifically "addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants." 467 U.S. at 486, 104 S. Ct. at 2533. The Court recognized that although it is well established that the State may not destroy evidence in an effort to circumvent *Brady* requirements, it is "[l]ess clear from our access-to-evidence cases" the "extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession." *Id.*

[¶27.]     According to the Court, "[t]he absence of doctrinal development in this area reflects, in part, the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight." *Id.* Further, "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id.* Courts also face difficulty in fashioning a remedy.

[¶28.]     Ultimately, the Court determined that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488, 104 S. Ct. at 2534. Further, "[t]o meet this standard of constitutional materiality," the defendant must establish that the evidence

"possess[es] an exculpatory value that was *apparent* before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S. Ct. at 2534 (emphasis added); *accord United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (discussing the constitutional standard of materiality); *State v. Lyerla*, 424 N.W.2d 908, 911 (S.D. 1988) (applying *Trombetta*). Once this standard of constitutional materiality has been shown, a failure to preserve such evidence for use by a defendant is a due process violation.

[¶29.] In *Arizona v. Youngblood*, the United States Supreme Court addressed what due process requires in situations involving only *potentially useful* evidence. 488 U.S. 51, 57, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988). It concluded that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* In regard to potentially useful evidence, a defendant must show bad faith on the part of the government when the loss of evidence is attributable to the government. *Id.* at 58, 109 S. Ct. at 337; *accord Illinois v. Fisher*, 540 U.S. 544, 549, 124 S. Ct. 1200, 1203,157 L. Ed. 2d 1060 (2004) (internal citation omitted) (noting that the applicability of the bad faith requirement depends on "the distinction between 'material exculpatory' evidence and 'potentially useful' evidence").

[¶30.] The reason for the difference, the Court remarked, "stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process

Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337 (internal citation omitted). We have concluded the same. *See, e.g.*, *State v. Danielson*, 2012 S.D. 36, ¶ 37, 814 N.W.2d 401, 412; *State v. Bruce*, 2011 S.D. 14, ¶ 13, 796 N.W.2d 397, 402; *State v. Bousum*, 2003 S.D. 58, ¶ 15, 663 N.W.2d 257, 262.[2]

[¶31.]    Relying on the above cases, Jackson contends that he need not prove bad faith on the part of the State because "it is obvious that any statements by K.S. would be expected to play a significant role in his defense." Jackson notes the progressive nature of K.S.'s disease and emphasizes that the four-month delay between the date of the alleged offense and his indictment prevented him from obtaining evidence from K.S.[3] In Jackson's view, due process requires dismissal in this case because he was reliant on law enforcement's efforts to gather pertinent information and the significance of K.S.'s statements "was apparent at the time of the investigation[.]"

---

2.    Jackson contends that this Court's past decisions in *Danielson*, *Bruce*, and *Bousum* have incorrectly said that bad faith is required in any case of lost or destroyed evidence. While these cases may not have drawn a clear distinction between cases involving material exculpatory evidence and evidence that is only *potentially useful*, a review of the facts in each case reveals that each involved only potentially useful evidence and thus required a showing of bad faith in order to establish a due process violation.

3.    Jackson's reliance on *State v. Larson*, 2009 S.D. 107, 776 N.W.2d 254 is misplaced. *Larson* did not involve an alleged delay in charging an offense due to a failure to investigate. Rather, the issue in *Larson* was the failure to have a probable cause determination within 48 hours of Larson's arrest and the loss of potentially exculpatory evidence as a result. *Id.* ¶ 7, 776 N.W.2d at 257.

[¶32.]     Jackson's conclusory statements about the nature of the evidence at issue support only an assumption that an interview of K.S. would have produced evidence favorable to his defense, and he has not identified how an evidentiary hearing on his motion would have elevated this assumption. It is just as likely that an interview on or near November 18, 2016 would have produced evidence to support the prosecution.

[¶33.]     Because an interview of K.S. on or near November 18 could have, at most, provided *potentially useful* evidence, Jackson must show bad faith on the part of the State. This he has not done. There is no evidence that law enforcement's decision not to interview K.S. was made in a calculated effort to gain a tactical advantage or to suppress exculpatory evidence. The record reveals that on and near November 18, 2016, K.S. was in fact questioned by her medical providers about her contact with Jackson, and these providers testified to her mental and physical capabilities on or near this relevant timeframe.[4] The testimony from law

---

4.     For example, Nurse Kilber described her interactions with K.S. at Bella Vista. She indicated that K.S. "a lot of time thought that she was a worker and she would get confused about what she was doing." Kilber further explained that "she would be at the door or going down to the dining room and trying to assist people. And she just didn't really know kind of what was going on on a daily basis." Kilber described that K.S. would walk normally some days and lose her balance on others. She had difficulty with "her ability to take a skill and do multiple steps." She had difficulty getting dressed. She had object recognition issues. For example, if she was given a spoon, she would need to be shown how to use it because she would forget that a spoon was for eating.

The director of nursing, Heather Anderson, described K.S. as "very pleasant, very nice." She further explained that even though K.S. would not remember her name when she attended to her, "You could grab her hand and she'd just go along with you. She had, like, this innocence . . . . She had such a pretty

(continued . . .)

enforcement revealed that their decision not to interview K.S. was based on their understanding of her mental condition gleaned from her family and her medical providers, including those conducting the sexual assault examination who related K.S.'s inability to answer pertinent questions. Given the absence of bad faith here, the circuit court properly denied Jackson's motion to dismiss the indictment.

## 2. Whether the circuit court erred when it determined that knowledge is not an element of SDCL 22-22-1(3).

[¶34.] Jackson asserts the circuit court erred in refusing to instruct the jury that a defendant's knowledge of an alleged victim's incapacity to consent is an element that must be proven to establish guilt under SDCL 22-22-1(3). Jackson acknowledges that a *mens rea* requirement is not contained within the language of this statute and further recognizes that in *Schuster*, we specifically held that knowledge is not an element of rape as described in this subsection. *See* 502 N.W.2d at 569.[5] However, Jackson asks us to revisit our holding in *Schuster* in light of *State v. Jones*, 2011 S.D. 60, ¶ 15, 804 N.W.2d 409, 414. In *Jones*, we held that despite the absence of a *mens rea* requirement in SDCL 22-22-1(4), the State must prove that the defendant knew or reasonably should have known the victim was too intoxicated to consent. According to Jackson, the concern identified by the majority opinion in *Jones*—the risk of criminalizing "a broad range of apparently

---

(. . . continued)
    smile. And she was just childlike. I mean, you could ask her to do things; she would do them."

5.     Although the *Schuster* opinion refers to SDCL 22-22-1(2), the numbering of the subsections under SDCL 22-22-1 has since changed. The identical language examined in *Schuster* is now related in SDCL 22-22-1(3).

innocent conduct"—applies with equal force in interpreting whether SDCL 22-22-1(3) necessarily includes a knowledge element.

[¶35.] "Statutory interpretation is a question of law subject to de novo review." *Jones*, 2011 S.D. 60, ¶ 8, 804 N.W.2d at 412 (quoting *State v. Davis*, 1999 S.D. 98, ¶ 7, 598 N.W.2d 535, 537). Relevant here, the Legislature has defined rape, in part, as "an act of sexual penetration accomplished with any person . . . (3) If the victim is incapable, because of physical or mental incapacity, of giving consent to such act[.]" SDCL 22-22-1(3).

[¶36.] Courts confronting the issue whether a criminal offense includes a *mens rea* element look to "[t]he language of the statute [as] the *starting place* in [the] inquiry[.]" *Staples v. United States*, 511 U.S. 600, 605, 114 S. Ct. 1793, 1797, 128 L. Ed. 2d 608 (1994) (emphasis added); *see also Jones*, 2011 S.D. 60, ¶ 11, 804 N.W.2d at 413 (quoting *State v. Nagel*, 279 N.W.2d 911, 915 (S.D. 1979)) ("Whether criminal intent or guilty knowledge is an essential element of a statutory offense is to be determined by the language of the act in connection with its manifest purpose and design."). However, our inquiry on this issue is not limited to the interpretation of the text of SDCL 22-22-1(3). Unlike our traditional analysis governing other issues of statutory interpretation, the constitutional right to due process may require courts to read a *mens rea* element into a statute defining a criminal offense even though it is silent on this issue.

[¶37.] Indeed, we recently acknowledged the established rule that "'[t]he fact that [a] statute does not specify any required mental state . . . does not mean that none exists' because *generally* 'a guilty mind is a necessary element in the

indictment and proof of every crime.'"[6]  *State v. Armstrong*, 2020 S.D. 6, ¶ 33, 939 N.W.2d 9, 17 (emphasis added) (quoting *Elonis v. United States*, 575 U.S. 723, ___ 135 S. Ct. 2001, 2009, 192 L. Ed. 2d 1 (2015)).  However, this general rule favoring a *mens rea* element yields in certain instances, including perhaps most notably, when addressing sex offenses where a victim's status impacts the ability to provide consent.  *See Morissette v. United States*, 342 U.S. 246, 251 n.8, 72 S. Ct. 240, 244 n.8, 96 L. Ed. 288 (1952) (noting "[e]xceptions [to the common law *mens rea* presumption] came to include sex offenses, such as rape, in which the victim's actual age was determinative despite defendant's reasonable belief that the girl had reached age of consent").

[¶38.]     We recognized such an exception in *Schuster*, where we rejected the identical argument made by Jackson here—that a defendant's knowledge of the victim's inability to give consent because of physical or mental incapacity is an element of the crime despite the absence of statutory language expressing a *mens rea* requirement.  502 N.W.2d at 569.  We found persuasive the reasoning of other courts "that the perpetrator's knowledge is not an issue in the rape of a person incapable of giving consent" because the crime is analogous to statutory rape of an underaged person, which does not require knowledge of the victim's age.  *Id.* (citing *State v. Sullivan*, 298 N.W.2d 267, 273 (Iowa 1980) (finding the public policy of

---

6.     In *State v. Armstrong*, we required a *mens rea* element in crimes charged under SDCL 22-22-45, a statute that does not address the commission of a sexual offense, but instead criminalizes the act of *communicating a threat* to commit such an offense.  2020 S.D. 6, ¶¶ 36–37, 939 N.W.2d 9, 18.  Our cases pertaining to criminal statutes of this nature often implicate First Amendment concerns.  *See id.*

protecting those with mental incapacity to "outweigh the danger of mistake"); *State v. Meyer*, 226 P.2d 204, 207–08 (Wash 1951) (noting "certain types of statutory crimes in the commission of which the perpetrator acts at his peril")).

[¶39.] After noting that we had previously declined to require defendants to have knowledge of an alleged rape victim's age, we likewise declined to require a defendant to have knowledge of an alleged rape victim's inability to consent due to physical or mental incapacity. *Id.* (citing *State v. Fulks*, 83 S.D. 433, 436–437, 160 N.W.2d 418, 420 (1968)). In so holding, we implicitly recognized that a victim's mental incapacity, like a victim's minority, falls within the realm of the traditional exceptions to the general presumption in favor of requiring a *mens rea* element in order to satisfy due process. *See id.* (citing *Fulks*, 83 S.D. at 436–437, 160 N.W.2d at 420). Therefore, the holding in *Schuster* controls, and the circuit court properly declined to instruct the jury that knowledge is an element of SDCL 22-22-1(3).

[¶40.] Moreover, neither our subsequent case law nor the legislative history surrounding SDCL 22-22-1 support a requirement of knowledge as an element of SDCL 22-22-1(3). Although Jackson suggests that *Jones* called *Schuster* into doubt, we disagree.[7] The Court in *Jones*, while interpreting SDCL 22-22-1(4), distinguished the rape of an allegedly intoxicated victim from "typical statutory rape cases [where] nonconsent is conclusively presumed because of age *or physical*

---

7. We recognize the different outcomes in *Jones* and *Schuster* despite the similarity of the statutory text used by the Legislature in subsections (3) and (4) of SDCL 22-22-1. However, neither party has asked us to reconsider our holding in *Jones*, and it is unnecessary to do so in determining the question here—whether to require a *mens rea* element in cases charged under SDCL 22-22-1(3). Because *Schuster* was properly decided, we decline to re-examine its holding.

*or mental incapacity.*"[8]  2011 S.D. 60, ¶ 14, 804 N.W.2d at 414 (emphasis added).  In addition, we note that while amending SDCL 22-22-1 multiple times after *Schuster* (in 1994, 2000, and 2005), the Legislature did not include language in SDCL 22-22-1(3) imposing a *mens rea* requirement.  Perhaps even more telling, the Legislature has not amended this subsection after the Court's decision in *Jones* (despite another amendment to SDCL 22-22-1 in 2012).

### 3. Whether the circuit court abused its discretion in restricting Dr. Swenson's testimony.

[¶41.]     Jackson claims that the court "tied his hands and directly impeded his ability to put on a defense" by precluding Dr. Swenson from testifying about capacity to consent to sexual activity as opposed to other types of capacity; in prohibiting Dr. Swenson from testifying to what questions he believed K.S. should have been asked; and by limiting Dr. Swenson's testimony to his review of K.S.'s condition during the October to November 2016 timeframe.  Jackson further asserts that had the court not restricted Dr. Swenson's testimony, Dr. Swenson would have testified about K.S.'s interactions with treatment providers after November 2016 as evidence of her lucidity, awareness, and reasoned thinking.  In his view, this evidence would have supported his theory that K.S. may have had the capacity to consent on November 18, 2016, despite the progressive nature of her disease.

---

8.     To the extent Jackson suggests otherwise, the Court's holding in *Jones* did not mandate an *actual knowledge* requirement.  Instead, the Court held that in cases charged under SDCL 22-22-1(4), "the State must prove the defendant knew *or reasonably should have known* that the complainant's intoxicated condition rendered her incapable of consenting."  2011 S.D. 60, ¶ 15, 804 N.W.2d at 414 (emphasis added).

[¶42.] A circuit court has broad discretion regarding the admission of expert testimony. *State v. Kryger*, 2018 S.D. 13, ¶ 19, 907 N.W.2d 800, 809. Therefore, we review the circuit court's decision to exclude expert testimony for an abuse of discretion. *State v. Wills*, 2018 S.D. 21, ¶ 24 n.5, 908 N.W.2d 757, 765 n.5. Under SDCL 19-19-702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) The testimony is based on sufficient facts or data;
>>
>> (c) The testimony is the product of reliable principles and methods; and
>>
>> (d) The expert has reliably applied the principles and methods to the facts of the case.

[¶43.] "South Dakota courts determine the admissibility of scientific evidence in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." *State v. Lemler*, 2009 S.D. 86, ¶ 22, 774 N.W.2d 272, 280. Jackson, as the party seeking to admit Dr. Swenson's testimony, bears the burden of demonstrating that the proffered testimony is "based on scientifically valid principles" that will satisfy the reliability demands. *Id.* ¶ 23 (citation omitted).

[¶44.] Based on our review of the *Daubert* hearing, the circuit court properly determined that Jackson failed to establish the admissibility of Dr. Swenson's testimony as to different types of capacity to consent. During the hearing, Dr.

Swenson explained that he relied on his training and experience, and in part, on the publication—*Assessment of Older Adults with Diminished Capacity: A Handbook for Psychologists*. This handbook, according to Dr. Swenson, "addresses basically all of the types of capacity issues that people like [Dr. Swenson] are faced with when we evaluate patients like [K.S.]." Dr. Swenson also testified about different types of consent (e.g., consent to medical treatment, consent to sex) and different types of capacities to consent (e.g., capacity to handle one's finances, capacity to consent to sex). However, Dr. Swenson did not dispute the circuit court's conclusion "that there are no generally accepted approaches or criteria for the assessment of consent to sexual activity[.]" Notably, despite the court's ruling, Jackson was able to elicit testimony from Dr. Swenson at trial that K.S.'s inability to clothe, feed, or care for herself did not "equate[] to a lack of capacity to consent."

[¶45.]       In addition, Jackson has not established that the circuit court abused its discretion in precluding Dr. Swenson from testifying about the specific questions he believed K.S. should have been asked related to her capacity to consent to sexual activity. The court aptly noted that Dr. Swenson was conflating the defense of consent, which is often raised to negate the element of coercion in cases involving second-degree rape, with the statutory element at issue here, namely whether an alleged victim had the *capacity* to consent. The essential element the State must prove under SDCL 22-22-1(3) is whether K.S. was "*incapable*, because of physical or mental incapacity, of giving consent to such act." Whether K.S.'s actions or words on November 18, 2016, may have indicated that she consented to sexual activity is

not relevant to this inquiry. Therefore, the court properly excluded testimony that would have confused the issue before the jury.

[¶46.] Finally, Jackson has not established that the court abused its discretion in restricting the medical records about which Dr. Swenson could testify. Although the State was allowed to put on evidence related to the progression of K.S.'s disease prior to October 2016, this evidence was relevant to show why K.S. began residing at Holiday Hills and how Jackson deliberately sought her whereabouts after she moved to Bella Vista. The court's limitation of evidence relating to K.S.'s continued deterioration as time went by was reasonable given that the parties do not dispute the progressive nature of K.S.'s disease. Moreover, although Jackson was restricted from admitting specific evidence related to K.S.'s mental state after November 2016, he was nonetheless able to utilize records from the October and November 2016 timeframe to suggest that despite her disease, K.S. had demonstrated lucid moments both prior to and shortly after the offense in question.[9]

---

9. For example, Dr. Bade testified that as a result of her initial assessment, she rated K.S. at a three on a scale of one to fifteen reflecting a "brief inventory of mental status." According to Dr. Bade, K.S. underwent a "Short Portable Mental Status Questionnaire" on November 7, 2016, and gave only two correct answers, with eight incorrect answers, indicating "severe intellectual impairment." Yet, she rated K.S. at a 4.2 on a scale of one to six for the Allen Cognitive Level, which pertains to a person's ability to function. Dr. Bade further related that as of November 18, 2016, K.S.'s therapist believed that therapy was helping to improve K.S.'s mood, her adjustment to Bella Vista, orientation, and her ability to think more clearly. In addition, a progress note dated November 21, 2016 (three days after the charged offense) stated that K.S. "did not struggle as much today to express her thoughts as much as her thought process is tangential. She struggles in her word finding, but today this was better."

### 4. Whether the circuit court abused its discretion when it denied Jackson's motion for a continuance.

[¶47.] Three days prior to trial, Jackson filed a motion to continue based upon events that had transpired with respect to the State's proffer, and later withdrawal, of Dr. Cherry's anticipated testimony. On appeal, Jackson asserts that the court's denial of his continuance motion was improper and therefore warrants a reversal of his conviction and a remand for a new trial. Although he did not cast the issue before the circuit court in this same light, Jackson now poses a two-fold question for this Court—whether prosecutorial misconduct occurred, and if so, whether the misconduct affected the jury verdict or harmed his substantial rights.

[¶48.] According to Jackson, the State engaged in misconduct by initially representing that Dr. Cherry would opine on K.S.'s lack of capacity to consent on November 18, 2016, while at the same time objecting to Jackson's proffered testimony from Dr. Swenson that it was *not* possible to make this determination because no one had properly questioned her in a timely manner. Jackson then points to the State's later failure to fully disclose the reason why the State withdrew Dr. Cherry as a witness (i.e., that he had an opinion similar to Dr. Swenson's) until just days before trial. Jackson asserts that this conduct violated counsel's "ethical obligations, two court orders," and "Jackson's due process rights pursuant to *Brady*." There are several problems with Jackson's argument.

[¶49.] First, *Brady* is inapplicable here. "We have noted on numerous occasions that the *Brady* rule only applies to situations where the defendant discovers *after* trial that the prosecutor had material evidence that was not disclosed during the trial." *State v. Fool Bull*, 2009 S.D. 36, ¶ 38, 766 N.W.2d 159,

#28800

168 (quoting *State v. Fender*, 2001 S.D. 27, ¶ 11, 623 N.W.2d 49, 52) (citing *State v. Knecht*, 1997 S.D. 53, ¶ 18, 563 N.W.2d 413, 420; *State v. Fox*, 313 N.W.2d 38, 40 (S.D. 1981); *State v. Moves Camp*, 286 N.W.2d 333, 339 (S.D. 1979); *State v. Sahlie*, 277 N.W.2d 591, 596 (S.D. 1979)). There is no dispute that Jackson learned—prior to trial—that Dr. Cherry could not offer an opinion on K.S.'s capacity to consent on November 18, 2016, for a similar reason expressed by Jackson's expert.

[¶50.] Second, while defense counsel alluded to "significant concerns" about the State's representations to the circuit court and counsel when withdrawing Dr. Cherry as a witness, counsel did not argue that the State committed prosecutorial misconduct.[10] Nevertheless, even if Jackson had more clearly framed his prosecutorial misconduct claim before the circuit court, we must view it from the standpoint of the remedy he sought but did not obtain—a continuance of the trial to allow him to present this testimony from Dr. Cherry.

[¶51.] Jackson argues that the circuit court's denial of his motion to continue, made three days before the scheduled trial date, effectively prevented him from being able to call Dr. Cherry. He also contends that he was prejudiced by the court's denial of a continuance because Dr. Cherry's testimony "would have been

_____

10. In response to the concerns Jackson raised in conjunction with his continuance motion, the State maintained that a misunderstanding had occurred between counsel for the State and Dr. Cherry. The State explained that Dr. Cherry believed the State's request for an opinion on K.S.'s capacity on "the date in question" referred to the date the doctor interviewed K.S., rather than the date of the *alleged offense*. According to the State, this misunderstanding did not come to light until after the circuit court ordered the State to provide a written report from Dr. Cherry as to his opinion of K.S.'s capacity on the date of the offense. Counsel for the State further explained that the State would not have filed a notice of intent to offer Dr. Cherry's testimony knowing that he could not provide such an opinion.

-25-

enormously useful for the jury's understanding of the facts of the case" and the testimony would have "corroborated the defense expert opinion regarding the lack of [an] interview with K.S." Jackson notes that nothing in the record indicates that the State would have been prejudiced by a continuance. He further claims that his request was not motivated by procrastination, bad planning, dilatory tactics, or bad faith; rather, he made the motion because the State's lack of candor regarding Dr. Cherry's opinion resulted in Jackson's late discovery of the reason Dr. Cherry was withdrawn.

[¶52.] The decision to grant or deny a continuance "is within the sound discretion of the [circuit] court and its rulings will not be disturbed absent a clear showing of abuse of discretion." *State v. Onken*, 2008 S.D. 112, ¶ 21, 757 N.W.2d 765, 771 (quoting *State v. Lang*, 354 N.W.2d 723, 724 (S.D. 1984)). "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *State v. Waugh*, 2011 S.D. 71, ¶ 11, 805 N.W.2d 480, 483 (citation omitted).

[¶53.] When a continuance is sought to obtain the testimony of an unavailable witness, three requirements must be established: (1) the testimony must be material; (2) the party seeking the continuance must have used due diligence to secure the witness's attendance or deposition; and (3) "it must be reasonably certain the presence of the witness or [the] testimony will be procured by the time to which the trial would be postponed." *State v. Karlen*, 1999 S.D. 12, ¶ 24, 589 N.W.2d 594, 600 (quoting *State v. Letcher*, 1996 S.D. 88, ¶ 30, 552 N.W.2d 402,

407). "[I]f the defendant has failed to establish any of the three requirements, the court has not abused its discretion in denying the continuance." *Id.*

[¶54.]     In denying the continuance here, the circuit court noted that the circumstances surrounding the State's withdrawal of Dr. Cherry as a witness were "a little odd" and that "it would have been more helpful if the State had a written report so they knew precisely what the doctor was going to say." However, contrary to Jackson's assertion, the court found the proffered testimony from Dr. Cherry—that he was unable to render an opinion as to K.S.'s capacity on the date in question—was not exculpatory. The court further determined that Dr. Cherry's testimony would be cumulative to the testimony proffered by Dr. Swenson.

[¶55.]     From our review, the record supports the court's determination that Dr. Cherry's testimony would have been essentially the same as Dr. Swenson's in the sense that both proclaimed an inability to opine on K.S.'s capacity to consent on the date in question without having assessed her close to that timeframe. Jackson's proffered use of Dr. Cherry's testimony was primarily to bolster the anticipated testimony from his own expert witness. Moreover, it is clear from the trial record that notwithstanding the inability to call Dr. Cherry, Jackson was able to present to the jury his theory that law enforcement's failure to interview K.S. raises reasonable doubt as to whether she had the capacity to consent to sexual relations. In fact, Jackson's counsel was able to argue this theory extensively throughout trial, not only through Dr. Swenson's testimony, but also through the cross-examination of the State's other witnesses.

[¶56.] Because of the cumulative nature of Jackson's proffered testimony from Dr. Cherry, it was not material to Jackson's defense. Therefore, the circuit court did not abuse its discretion in denying Jackson's motion for a continuance.

[¶57.] Affirmed.

[¶58.] JENSEN, and SALTER, Justices, concur.

[¶59.] GILBERTSON, Chief Justice, and MYREN, Circuit Court Judge, concur specially.

[¶60.] MYREN, Circuit Court Judge, sitting for KERN, Justice, disqualified.


GILBERTSON, Chief Justice (concurring specially).

[¶61.] I join in the Court's opinion with one exception. I would reverse the holding of *State v. Jones*, 2011 S.D. 60, 804 N.W.2d 409, for the reasons stated in the dissents of Justice Zinter and myself in that case. While the Court today very appropriately adheres to its holding in *State v. Schuster*, 502 N.W.2d 565 (S.D. 1993), it unfortunately leaves intact the holding in *Jones*.

[¶62.] While the Court today is correct that the Legislature has not amended SDCL 22-22-1(3) since *Jones*, the issue has hardly been dormant. In at least two of the more recent legislative sessions, bills have been introduced to do exactly that. The legislative intent behind SDCL 22-22-1 remains at odds with *Jones'* holding. It is clear that the last chapter of this issue remains an open one with the final determination yet to be written.

[¶63.] MYREN, Circuit Court Judge, joins this writing.